131 Nev., Advance Opinion 39

IN THE SUPREME COURT OF THE STATE OF NEVADA

KEVIN JAMES LISLE,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 55173

**FILED**

JUN 25 2015

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY
CHIEF DEPUTY CLERK

Appeal from a district court order dismissing a post-conviction petition for a writ of habeas corpus in a death penalty case. Eighth Judicial District Court, Clark County; Michael Villani, Judge.

*Affirmed.*

Rene L. Valladares, Federal Public Defender, and Michael Pescetta, David Anthony, and Albert Sieber, Assistant Federal Public Defenders, Las Vegas,
for Appellant.

Adam Paul Laxalt, Attorney General, Carson City; Steven B. Wolfson, District Attorney, and Steven S. Owens, Chief Deputy District Attorney, Clark County,
for Respondent.

---

BEFORE THE COURT EN BANC.

*OPINION*

By the Court, PARRAGUIRRE, J.:

A jury found appellant Kevin James Lisle guilty of first-degree murder with the use of a deadly weapon in the drive-by shooting of Kip Logan and sentenced him to death. Under Nevada law, Lisle may collaterally challenge his conviction and sentence in a post-conviction

petition for a writ of habeas corpus. There are two procedural bars to filing a petition that are relevant here: the petition must be filed within a certain period of time unless the petitioner shows cause for his delay; and the petitioner is limited to one petition absent a demonstration of good cause and actual prejudice. Where a petitioner cannot demonstrate cause and prejudice, we have recognized an exception to these bars against untimely and successive petitions: the petitioner must show that the failure to consider the petition on its merits would result in a fundamental miscarriage of justice, meaning the imprisonment of a person who is actually innocent of the offense for which he was convicted or the execution of a person who is actually innocent of the death penalty.

Lisle filed a petition that was untimely and successive. The district court dismissed the petition on the ground that it was procedurally barred. In this appeal from the district court's order, we must determine whether a petitioner can demonstrate that he is actually innocent of the death penalty by presenting new evidence of mitigating circumstances. We hold that he cannot. In the context of a challenge to a death sentence, the actual-innocence exception to the procedural bars is focused on the elements of first-degree murder and the aggravating circumstances, not mitigating circumstances, because it is the former that determine death eligibility. Because we conclude that Lisle's claims do not warrant relief, we affirm the district court's order dismissing his petition.

## FACTS AND PROCEDURAL HISTORY

The facts underlying Lisle's conviction are set forth in detail in this court's 1997 opinion affirming Lisle's conviction and sentence. *Lisle v. State*, 113 Nev. 540, 937 P.2d 473 (1997), *decision clarified on denial of reh'g*, 114 Nev. 221, 954 P.2d 744 (1998). In this opinion, we recount only those facts necessary to an understanding of the issues presented.

On the evening of October 22, 1994, John Melcher was driving on a Las Vegas freeway and pulled his van alongside a Mustang driven by Kip Logan. Lisle, the front passenger in Melcher's van, shot and killed Logan. Adam Evans[1] was in the van's back seat, and he and Melcher testified against Lisle at trial. The jury found Lisle guilty of first-degree murder with the use of a deadly weapon, found a single aggravating circumstance (the murder was committed by a person who knowingly created a great risk of death to more than one person), found "other mitigating circumstances," and concluded that the mitigating circumstances did not outweigh the aggravating circumstance. The jury sentenced Lisle to death. This court affirmed the judgment and sentence, and the remittitur issued on November 16, 1998.

Lisle then filed a timely post-conviction petition for a writ of habeas corpus, and the district court appointed counsel to supplement and litigate the petition. The district court denied the petition, and this court affirmed the district court's order. *Lisle v. State*, Docket No. 36949 (Order of Affirmance, August 21, 2002). The remittitur from that appeal issued on September 17, 2002. Lisle filed his second post-conviction habeas petition on August 25, 2008, claiming that he received ineffective assistance of trial, appellate, and post-conviction counsel. The district court dismissed the petition as procedurally barred, and this appeal followed.

## DISCUSSION

Lisle's petition was procedurally barred. The petition was untimely because it was filed nearly 10 years after the remittitur issued

---

[1]The 1997 opinion refers to him as Anthony Evans.

from the appeal of his judgment of conviction. *See* NRS 34.726(1). The petition was also successive where it raised claims that could have been brought in earlier proceedings, and an abuse of the writ where it raised claims new and different from those in his first post-conviction habeas petition. *See* NRS 34.810(1)(b)(2); NRS 34.810(2). To excuse the procedural bars so that his petition would be considered on the merits, Lisle raised several claims alleging good cause and prejudice. *See* NRS 34.726(1); NRS 34.810(1)(b), (3); *see also State v. Huebler*, 128 Nev., Adv. Op. 19, 275 P.3d 91, 94-95 (2012) (explaining that "good cause for delay" under NRS 34.726(1) requires that the delay is not the petitioner's fault and that the petitioner will be unduly prejudiced), *cert. denied*, 568 U.S. ___, 133 S. Ct. 988 (2013). He also argued that, in the absence of good cause, he was actually innocent of the crime and of the death penalty such that the failure to consider the merits of his petition would result in a fundamental miscarriage of justice. *See Pellegrini v. State*, 117 Nev. 860, 887, 34 P.3d 519, 537 (2001). Because we conclude that Lisle failed to demonstrate either good cause to excuse the procedural bars or that he was actually innocent, we do not reach the merits of his claims challenging his conviction and sentence.

*Lisle failed to demonstrate good cause and prejudice*

Lisle argues that the district court erred in dismissing his petition as procedurally barred because he established good cause and prejudice by showing that the State withheld impeachment evidence regarding witnesses Melcher, Evans, and Larry Prince in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). We have acknowledged that a *Brady* violation may provide good cause and prejudice to excuse the procedural bars to a post-conviction habeas petition. *See Mazzan v. Warden*, 116 Nev. 48, 67, 993 P.2d 25, 37 (2000). A successful *Brady* claim

has three components: "the evidence at issue is favorable to the accused; the evidence was withheld by the state, either intentionally or inadvertently; and prejudice ensued, i.e., the evidence was material." *Id.* The second and third components of a *Brady* violation parallel the good cause and prejudice showings required to excuse the procedural bars to an untimely and/or successive post-conviction habeas petition. *State v. Bennett*, 119 Nev. 589, 599, 81 P.3d 1, 8 (2003). "[I]n other words, proving that the State withheld the evidence generally establishes cause, and proving that the withheld evidence was material establishes prejudice." *Id.* But, "a *Brady* claim still must be raised within a reasonable time after the withheld evidence was disclosed to or discovered by the defense." *Huebler*, 128 Nev., Adv. Op. 19, 275 P.3d at 95 n.3; *see also Hathaway v. State*, 119 Nev. 248, 254-55, 71 P.3d 503, 507-08 (2003) (holding that good cause to excuse an untimely appeal-deprivation claim must be filed within a reasonable time of learning that the appeal had not been filed).

Lisle has the burden of demonstrating the elements of the *Brady* claim as well as its timeliness. *Bennett*, 119 Nev. at 599, 81 P.3d at 8; *Mazzan*, 116 Nev. at 67, 993 P.2d at 37. He did not meet these burdens. He failed to demonstrate that his *Brady* claims were raised within a reasonable amount of time after discovery of the withheld evidence. Lisle admitted that he received some of the evidence regarding Melcher in 1995, 13 years before he filed the instant petition.[2] Although Lisle alleged that

___

[2]One week after trial, Lisle learned of Melcher's second interview with police, and on direct appeal, he challenged the State's failure to disclose the contents of that interview. This court concluded that the evidence had "little or no impeachment value" and was not material under *Brady. Lisle*, 113 Nev. at 548, 937 P.2d at 478. Lisle's claims are
*continued on next page . . .*

SUPREME COURT
OF
NEVADA

(O) 1947A

he was forced to seek discovery in federal court to obtain records from the Clark County District Attorney's Office and the Las Vegas Metropolitan Police Department, that such efforts began shortly after December 2003 and continued until May 2007, and that as a result, no less than four orders were issued in his favor, he did not specify when he received the remaining evidence regarding Melcher, Evans, or Prince or that he received it as a result of the federal discovery litigation. Accordingly, Lisle did not specify facts that demonstrated that he raised the *Brady* claim within a reasonable time after discovering the withheld evidence.

Lisle's other good-cause claims were similarly unavailing. Like the *Brady* claim, Lisle's good-cause claim based on the alleged ineffective assistance of first post-conviction counsel, *see Crump v. Warden*, 113 Nev. 293, 303, 934 P.2d 247, 253 (1997); *McKague v. Warden*, 112 Nev. 159, 165 n.5, 912 P.2d 255, 258 n.5 (1996), was untimely because it was not asserted within a reasonable time after it became available: the petition was filed nearly six years after the remittitur issued in the appeal from the denial of his first post-conviction habeas petition, *see Hathaway*, 119 Nev. at 252-53, 71 P.3d at 506; *Pellegrini*, 117 Nev. at 869-70, 34 P.3d at 526 (holding that the time bar at NRS 34.726 applies to successive petitions); *see also State v. Eighth Judicial Dist. Court (Riker)*, 121 Nev.

---

*. . . continued*

therefore barred by the doctrine of the law of the case. *See Hall v. State*, 91 Nev. 314, 315-16, 535 P.2d 797, 798-99 (1975). We decline Lisle's invitation to reconsider our previous conclusion because he failed to demonstrate that this court's prior decision was clearly erroneous or that any new or different evidence was substantial. *See Tien Fu Hsu v. County of Clark*, 123 Nev. 625, 630-31, 173 P.3d 724, 728-29 (2007).

SUPREME COURT
OF
NEVADA

(O) 1947A

225, 232, 112 P.3d 1070, 1075 (2005) (holding that a petitioner "must plead and prove specific facts that demonstrate good cause" to excuse an abusive petition). Lisle's remaining good-cause claims—that *Polk v. Sandoval*, 503 F.3d 903 (9th Cir. 2007), excused any procedural bars to his claim challenging the premeditation jury instruction; that counsel, not Lisle, caused any delays; and that this court's alleged inconsistent application of the procedural bars and Lisle's health problems excused all of the procedural bars—also lacked merit. *See Nika v. State*, 124 Nev. 1272, 1286-87, 1289, 198 P.3d 839, 849-50, 851 (2008) (disagreeing with *Polk* and holding that the premeditation instruction set forth in *Byford v. State*, 116 Nev. 215, 236-37, 994 P.2d 700, 714-15 (2000), did not apply to cases that were final when *Byford* was decided); *Hathaway*, 119 Nev. at 252, 71 P.3d at 506 (holding that a petitioner must show an impediment external to the defense to overcome procedural bars); *cf. Phelps v. Dir., Nev. Dep't of Prisons*, 104 Nev. 656, 660, 764 P.2d 1303, 1306 (1988) (holding that mental deficiency and lack of legal knowledge do not constitute good cause), *superseded by statute on other grounds as stated in State v. Haberstroh*, 119 Nev. 173, 180-81, 69 P.3d 676, 681 (2003); *Riker*, 121 Nev. at 236, 112 P.3d at 1077 (holding that this court does not arbitrarily "ignore[ ] procedural default rules" and that "any prior inconsistent application of statutory default rules would not provide a basis for this court to ignore the rules, which are mandatory").

*Lisle failed to demonstrate actual innocence*

Where a petition is procedurally barred and the petitioner cannot demonstrate good cause, the district court may nevertheless reach the merits of any constitutional claims if the petitioner demonstrates that failure to consider those constitutional claims would result in a

SUPREME COURT
OF
NEVADA

(O) 1947A

7

fundamental miscarriage of justice. *Pellegrini*, 117 Nev. at 887, 34 P.3d at 537. A fundamental miscarriage of justice requires "a colorable showing" that the petitioner "is actually innocent of the crime or is ineligible for the death penalty." *Id.* This generally requires the petitioner to present new evidence of his innocence. *House v. Bell*, 547 U.S. 518, 536-37 (2006); *Schlup v. Delo*, 513 U.S. 298, 316 (1995).

*Lisle did not demonstrate actual innocence of the crime*

Lisle argues that he was actually innocent of the murder and presented new evidence in the form of affidavits from his family members to show that he did not have facial hair at the time of the murders. Lisle's defense at trial was mistaken identity and that Melcher was the actual shooter, and his theory in the instant petition is that the presence of facial hair was the key factor at trial in determining the shooter's identity. Although there was conflicting testimony regarding who had how much facial hair, the key evidence at trial was not facial hair but rather the testimony of Melcher and Evans, who both admitted to being present at the crime and identified Lisle as the shooter. Accordingly, Lisle failed to demonstrate that, in light of his family's affidavits, no reasonable juror would have found him guilty of first-degree murder. *See Schlup*, 513 U.S. at 327 ("[T]he petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."); *Pellegrini*, 117 Nev. at 887, 34 P.3d at 537 (citing *Schlup*, 513 U.S. at 327).

*Lisle did not demonstrate actual innocence of the death penalty*

Lisle argues that he is actually innocent of the death penalty on two grounds: First, he argues that there was insufficient evidence of the single aggravating circumstance found by the jury. Second, he argues

that had the jury been presented with the new evidence of mitigating circumstances that he provided to the post-conviction court, no rational juror would have found him eligible for the death penalty.

The first ground underlying Lisle's actual-innocence claim, based on a challenge to the aggravating circumstance, lacks merit. Lisle points to no new evidence supporting his claim of actual innocence with respect to the aggravating circumstance. *See House*, 547 U.S. at 536-37; *Schlup*, 513 U.S. at 316. Nor do his arguments present any issue of first impression as to the legal validity of the aggravating circumstance. *Cf. Leslie v. Warden*, 118 Nev. 773, 779-82, 59 P.3d 440, 445-46 (2002) (applying actual-innocence exception based on legal validity of an aggravating circumstance); *Bennett*, 119 Nev. at 597-98, 81 P.3d at 6-7 (applying actual-innocence exception based in part on legal validity of an aggravating circumstance). Accordingly, Lisle has not demonstrated actual innocence based on his challenge to the aggravating circumstance, and we conclude that the district court did not err in declining on this basis to reach Lisle's procedurally barred claims.

The second ground underlying Lisle's actual-innocence claim presents an issue of first impression for this court: can a claim of actual innocence of the death penalty offered as a gateway to reach a procedurally defaulted claim be based on a showing of new evidence of mitigating circumstances? Although we have not answered that question,[3]

---

[3]On occasion we have assumed, without deciding, that new mitigating evidence could be offered to establish actual innocence of the death penalty as a gateway to consideration of a procedurally defaulted claim. *See, e.g.*, *Wilson v. State*, 127 Nev., Adv. Op. 68, 267 P.3d 58, 61 n.2 (2011).

the United States Supreme Court addressed it in *Sawyer v. Whitley*, 505 U.S. 333 (1992), in the context of a successive federal habeas petition challenging a Louisiana death sentence.

The *Sawyer* Court rejected the idea that the actual-innocence exception to procedural default should extend to the existence of new mitigating evidence. 505 U.S. at 345. The Court's conclusion was based primarily on two observations. First, extending actual innocence to include new mitigating evidence would reduce the exception "to little more than what is already required to show 'prejudice,' a necessary showing for habeas relief for many constitutional errors," such as ineffective assistance of counsel. *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). The Court reasoned that a petitioner should have to "show something more . . . than he would have had to show to obtain relief on his first habeas petition" to get "a court to reach the merits of his claims on a successive habeas petition." *Id.* Second, the subjective nature and breadth of mitigating circumstances "would so broaden the [actual innocence] inquiry as to make it anything but a 'narrow' exception to the principle of finality." *Id.* We agree that these observations counsel against opening the actual-innocence gateway to include new mitigating evidence, for otherwise the exception would swallow the procedural defaults adopted by the Legislature.

Lisle, however, argues that applying language in *Sawyer* to Nevada's death penalty scheme leads to the conclusion that, in Nevada, a petitioner should be allowed to demonstrate actual innocence of the death penalty by showing the existence of new mitigating evidence. In particular, Lisle focuses on the *Sawyer* Court's conclusion that "[s]ensible meaning is given to the term 'innocent of the death penalty' by allowing a

showing in addition to innocence of the capital crime itself a showing that there was no aggravating circumstance *or that some other condition of eligibility had not been met." Id.* (emphasis added). Lisle suggests that there is another "condition of eligibility" in Nevada, the weighing determination—whether mitigating circumstances are not sufficient to outweigh the aggravating circumstance(s). As support, Lisle points to a statement by this court that under Nevada law a defendant is "death-eligible" only if, in addition to at least one aggravating circumstance, the sentencing body "'finds that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found.'" *Johnson v. State*, 118 Nev. 787, 802, 59 P.3d 450, 460 (2002) (quoting NRS 175.554(3)), *overruled on other grounds by Nunnery v. State*, 127 Nev., Adv. Op. 69, 263 P.3d 235, 250-51 (2011).[4] Based on Lisle's analysis, new mitigation evidence could provide the basis for a claim that a petitioner is actually innocent of the death penalty.

---

[4]*See also Servin v. State*, 117 Nev. 775, 786, 32 P.3d 1277, 1285 (2001) (stating that to determine whether a defendant is death-penalty eligible, "(1) the jury must unanimously find, beyond a reasonable doubt, at least one enumerated aggravating circumstance; and (2) each juror must then individually determine that mitigating circumstances, if any exist, do not outweigh the aggravating circumstances. At this point, a defendant is death-eligible . . . ."); *Hollaway v. State*, 116 Nev. 732, 745, 6 P.3d 987, 996 (2000) (discussing the two necessary findings for a defendant to be eligible for death under Nevada's capital sentencing scheme: "the jury must find unanimously and beyond a reasonable doubt that at least one enumerated aggravating circumstance exists, and each juror must individually consider the mitigating evidence and determine that any mitigating circumstances do not outweigh the aggravating").

A careful review of *Sawyer* leads us to reject Lisle's analysis. Although this court has characterized the weighing determination as one of two findings required to make a defendant "death-eligible" in Nevada, the *Sawyer* Court used the word "eligibility" to refer to a more limited aspect of the process for imposing a death sentence. The Supreme Court has required that the capital sentencing process "narrow the class of murderers subject to capital punishment . . . by providing specific and detailed guidance to the sentencer" and allow for "consideration of the character and record of the individual offender and the circumstances of the particular offense." *McCleskey v. Kemp*, 481 U.S. 279, 303 (1987) (internal quotations omitted); *see also Arave v. Creech*, 507 U.S. 463, 471 (1993) (reiterating that a state's narrowing process "must 'channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death'" (quoting *Lewis v. Jeffers*, 497 U.S. 764, 774 (1990))). The Court has referred to the narrowing component of the capital sentencing process as the "eligibility" phase and the individualized-consideration component as the "selection" phase. *See, e.g., Buchanan v. Angelone*, 522 U.S. 269, 275 (1998) ("In the eligibility phase, the jury narrows the class of defendants eligible for the death penalty, often through consideration of aggravating circumstances. In the selection phase, the jury determines whether to impose a death sentence on an eligible defendant." (citation omitted)).

The Court's analysis in *Sawyer* comports with this understanding of the "eligibility" and "selection" phases of the capital sentencing process. After discussing the narrowing requirement and explaining that it was met under the Louisiana statute by the elements of

the capital offense and the finding of at least one statutory aggravating factor, *Sawyer*, 505 U.S. at 341-42, the *Sawyer* Court characterized that process as establishing "eligibility for the death penalty," *id.* at 342. The Court then explained that once the elements of the offense and at least one statutory aggravating factor had been found, the "emphasis shifts from narrowing the class of eligible defendants by objective factors to individualized consideration of a particular defendant." *Id.* at 343. At that point, "[c]onsideration of aggravating factors together with mitigating factors, in various combinations and methods dependent upon state law, results in the jury's or judge's ultimate decision as to what penalty shall be imposed." *Id.* The Court's explanation of the two-part sentencing process demonstrates that "eligibility" is used in *Sawyer* as a descriptor for the aspect of the capital sentencing process in which the class of defendants who may be subject to the death penalty is narrowed.

In contrast, this court used the term "eligibility" in the case cited by Lisle to refer to both aspects of the capital sentencing process—narrowing and individualized consideration. Our use of "eligibility" in this fashion does not reflect an expansion of the narrowing aspect of the capital sentencing process in Nevada to include individualized consideration. To the contrary, we have focused on the same factors as the Supreme Court in evaluating whether Nevada has sufficiently narrowed the class of defendants who may be sentenced to death—the elements of the offense and the statutory aggravating circumstances. *See, e.g., Hernandez v. State*, 124 Nev. 978, 983-84, 194 P.3d 1235, 1239 (2008) (discussing narrowing based on definition of murder by torture), *overruled on other grounds by Armenta-Carpio v. State*, 129 Nev., Adv. Op. 54, 306 P.3d 395, 396 (2013); *McConnell v. State*, 120 Nev. 1043, 1065-67, 102 P.3d 606,

621-23 (2004) (discussing narrowing based on elements of first-degree felony murder and aggravating circumstance based on a murder committed in the course of certain felonies). Our use of "eligibility" to refer to both aspects of the capital sentencing process stems from a relatively unique aspect of Nevada law that precludes the jury from imposing a death sentence if it determines that the mitigating circumstances are sufficient to outweigh the aggravating circumstance or circumstances. NRS 175.554(3); NRS 200.030(4). Although this statutory requirement limits the jury's discretion to sentence a person to death, it is not part of the narrowing aspect of the capital sentencing process.[5] Rather, its requirement to weigh aggravating and mitigating circumstances renders it, by definition, part of the individualized consideration that is the hallmark of what the Supreme Court has referred to as the selection phase of the capital sentencing process—the "[c]onsideration of aggravating factors together with mitigating factors" to determine "what penalty shall be imposed," *Sawyer*, 505 U.S. at 343.[6]

_____

[5]Addressing the use of "other matter" evidence at a capital penalty hearing, this court has stated that "use of [other matter] evidence would undermine the constitutional narrowing process which the enumeration and weighing of specific aggravators [against mitigating evidence] is designed to implement." *Hollaway v. State*, 116 Nev. 732, 746, 6 P.3d 987, 997 (2000). Neither *Hollaway* nor cases citing to it analyzed whether the weighing determination was a necessary part of the "constitutional narrowing process." *See, e.g., Butler v. State*, 120 Nev. 879, 895, 102 P.3d 71, 82 (2004); *Evans v. State*, 117 Nev. 609, 637, 28 P.3d 498, 517 (2001). To the extent that *Hollaway* and its progeny could be read to hold such, they are overruled.

[6]The way that Nevada law uses the weighing of mitigating and aggravating circumstances to limit the jury's discretion to sentence a
*continued on next page . . .*

The very nature of the weighing determination further supports our conclusion that the weighing determination is not what the *Sawyer* Court had in mind when it referred to a "condition of eligibility" other than aggravating circumstances that may be relevant to the actual-innocence gateway. In particular, the mitigating circumstances are not statutorily limited to an obvious class of relevant evidence, and the weighing determination itself is a moral determination, not an objective determination of facts.

First, as the *Sawyer* Court recognized, mitigating evidence is categorically different in its nature and breadth than the elements of the capital crime and statutory aggravating circumstances that the Court determined could be the basis for showing innocence of the death penalty. For example, the *Sawyer* Court observed that "[s]ensible meaning is given to the term 'innocent of the death penalty' by allowing a showing in addition to innocence of the capital crime itself[,] a showing that there was no aggravating circumstance or that some other condition of eligibility had not been met," because proof or disproof of the elements of the crime and the statutory aggravating circumstances are "confined by the statutory definitions to a relatively obvious class of relevant evidence." 505 U.S. at 345. In contrast, mitigating evidence cannot be confined by statute to a relatively obvious class of relevant evidence, *see Buchanan*, 522 U.S. at

---

*. . . continued*

person to death is not mandated by Supreme Court precedent. The Supreme Court does not require the states to "affirmatively structure in a particular way the manner in which juries consider mitigating evidence" and has suggested "that complete jury discretion is constitutionally permissible." *Buchanan*, 522 U.S. at 276.

276 (observing "that the sentencer may not be precluded from considering . . . any constitutionally relevant mitigating evidence"); NRS 200.035 (listing statutory mitigating circumstances and "[a]ny other mitigating circumstance"); rather, it includes "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death," *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *see also McCleskey*, 481 U.S. at 304 (indicating that "'compassionate or mitigating factors stem[ ] from the diverse frailties of humankind'" (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (plurality opinion))). And mitigation evidence can be a double-edged sword that may indicate diminished culpability but at the same time may indicate an increased risk of future dangerousness that merits the death penalty. *See Brewer v. Quarterman*, 550 U.S 286, 292-93 (2007).

Second, the *Sawyer* Court focused on the importance of objective standards in applying the actual-innocence inquiry in the context of the death penalty. As the Court explained, "[t]he phrase 'innocent of death' is not a natural usage of those words." *Sawyer*, 505 U.S. at 341; *see also Smith v. Murray*, 477 U.S. 527, 537 (1986) (acknowledging that actual innocence "does not translate easily into the context of an alleged error at the sentencing phase of a trial on a capital offense"). Therefore, "to construct an analog to the simpler situation represented by the case of a noncapital defendant" and make the very narrow exception for actual innocence "workable[,] it must be subject to determination by relatively objective standards." *Sawyer*, 505 U.S. at 341. The elements of a capital offense and the aggravating circumstances are "objective factors or conditions." *See id.* at 347. They therefore provide a workable standard

for applying the actual-innocence gateway in the context of a death sentence. *Id.* In contrast, the weighing of mitigating and aggravating circumstances does not allow for objective standards because it is a moral determination and, as such, it "'cannot be reduced to a scientific formula or the discovery of a discrete, observable datum.'" *Nunnery v. State*, 127 Nev., Adv. Op. 69, 263 P.3d 235, 252 (2011) (quoting *Ex parte Waldrop*, 859 So. 2d 1181, 1189 (Ala. 2002)). Opening the actual-innocence gateway to include new mitigating evidence thus does not present a workable analog.

Although we are not bound by the United States Supreme Court's decisions in interpreting state law, *see Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (reiterating the converse, that "a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus"), we find persuasive the Supreme Court's reasoning with its focus on the objective factors that narrow the class of offenders subject to the death penalty because that focus ensures rational reviewability and restrains the actual-innocence inquiry as a narrow gateway through which a petitioner may obtain review of claims that otherwise would be procedurally defaulted. We therefore conclude that an actual-innocence inquiry in Nevada must focus on the objective factors that make a defendant eligible for the death penalty, that is, the objective factors that narrow the class of defendants for whom death may be imposed. To hold otherwise would allow the exception to swallow the procedural bars. Accordingly, the district court did not err in rejecting Lisle's effort to circumvent the procedural bars to his petition by asserting a claim that he

was actually innocent of the death penalty based on new mitigation evidence.

## CONCLUSION

Lisle failed to demonstrate good cause to excuse his procedurally barred post-conviction petition for a writ of habeas corpus. Lisle also failed to demonstrate that he was actually innocent of either the crime or the death penalty. We therefore affirm the district court's order dismissing his post-conviction petition for a writ of habeas corpus.

_____, J.
Parraguirre

We concur:

_____, C.J.
Hardesty

_____, J.
Douglas

_____, J.
Gibbons

_____, J.
Pickering

CHERRY and SAITTA, JJ., dissenting:

In our view, the district court erred in denying the petition as procedurally barred without conducting an evidentiary hearing to determine the credibility of Lisle's new evidence of actual innocence. If it found that new evidence to be credible, it is more likely than not that no reasonable juror would have convicted Lisle or sentenced him to death in light of the new evidence, and he would therefore have overcome the procedural bars to having his underlying constitutional claims heard on the merits. *See Pellegrini v. State*, 117 Nev. 860, 887, 34 P.3d 519, 537 (2001) (stating the standard for demonstrating actual innocence).

Lisle presented new evidence that he was actually innocent of first-degree murder. Only four people besides the victim were present for the murder: Lisle; John Melcher and Adam Evans, who were in the vehicle with Lisle; and Jose Gonzales, the passenger in the victim's car. Lisle's primary defense at trial that Melcher was the shooter was supported by circumstantial evidence as well as by Gonzales's identification of Melcher as the shooter. Gonzales's statement also indicated that the shooter had scraggly facial hair, and the State sought to impeach his identification of Melcher as the shooter by eliciting extensive—although not uniform—testimony that Melcher did not have facial hair but that Lisle did.

Perfunctorily acknowledging the conflicting testimony about facial hair, the majority dismisses its importance because it considers the testimony of Evans and Melcher to be the "key" evidence in the case. However, by failing to acknowledge Evans' and Melcher's motives to fabricate their testimony, the majority did not consider the new evidence in light of all of the evidence. *See Schlup v. Delo*, 513 U.S. 298, 328 (1995) ("The habeas court must make its determination concerning the

petitioner's innocence in light of all the evidence." (quotation marks omitted)). Melcher and Evans had both been arrested in connection with the murder but struck deals with the State in exchange for testifying. Had the jury heard credible new evidence that Lisle, unlike the shooter, did not have facial hair, they more likely than not would have acquitted him.

Even if the new evidence of Lisle's innocence of the murder was not credible, he also presented new evidence of mitigating circumstances to demonstrate that he was actually innocent of the death penalty. Relying on *Sawyer v. Whitley*, 505 U.S. 333 (1992), the majority concludes that new evidence regarding aggravating circumstances can demonstrate actual innocence of the death penalty but that new evidence of mitigating circumstances cannot. We disagree.

The *Sawyer* Court affirmed the idea suggested in earlier cases that a defendant could be "actually innocent" of the death penalty but limited the inquiry to "those elements that render a defendant eligible for the death penalty." *Sawyer*, 505 U.S. at 343, 347. Eligibility for the death penalty in Nevada is set out in NRS 175.554(3), which states, "The jury may impose a sentence of death only if it finds at least one aggravating circumstance and further finds that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found." The plain meaning of a statute controls its interpretation. *State v. Lucero*, 127 Nev. 92, 95, 249 P.3d 1226, 1228 (2011). Here, the plain language of NRS 175.554(3) is that a defendant is eligible for the death penalty only if two elements are met: the jury finds at least one aggravating circumstance and the jury finds no mitigating circumstances outweigh the aggravating circumstance(s). Only after the jury has found

the defendant death-eligible does it decide *whether* death should be imposed. *See* NRS 175.554(2)(c). This court has for decades unequivocally and consistently followed this straightforward interpretation of Nevada's death penalty scheme. *See, e.g., Servin v. State*, 117 Nev. 775, 786, 32 P.3d 1277, 1285 (2001) ("In order to determine that a defendant is eligible for the death penalty, (1) the jury must unanimously find, beyond a reasonable doubt, at least one enumerated aggravating circumstance; and (2) each juror must then individually determine that mitigating circumstances, if any exist, do not outweigh the aggravating circumstances."); *accord Butler v. State,* 120 Nev. 879, 895, 102 P.3d 71, 82 (2004); *Johnson v. State,* 118 Nev. 787, 802, 59 P.3d 450, 460 (2002), *overruled on other grounds by Nunnery v. State,* 127 Nev., Adv. Op. 69, 263 P.3d 235, 250-51 (2011); *Evans v. State,* 117 Nev. 609, 634, 28 P.3d 498, 515 (2001); *Hollaway v. State,* 116 Nev. 732, 745, 6 P.3d 987, 996 (2000); *Middleton v. State,* 114 Nev. 1089, 1116-17, 968 P.2d 296, 314-15 (1998); *Geary v. State,* 110 Nev. 261, 267, 871 P.2d 927, 931 (1994); *Gallego v. State*, 101 Nev. 782, 790, 711 P.2d 856, 862 (1985).

Where the meaning of a statute is plain on its face, we do not look beyond that meaning. *Lucero*, 127 Nev. at 95, 249 P.3d at 1228. Yet the majority opinion does just that. Rather than rely on the plain meaning of Nevada statutes, the majority jumps to policy concerns the *Sawyer* Court expressed, then engages in semantic gymnastics in order to conclude that Nevada's death penalty scheme is something other than what the statutes plainly make it. The *Sawyer* Court and the majority appear to be concerned with making the actual-innocence inquiry "workable." But if to make the death penalty and its attendant post-conviction proceedings "workable" means that we ignore new evidence that

demonstrates that a defendant should not have been sentenced to death, then perhaps the death penalty itself is not workable.

In the instant case, Lisle produced detailed reports from two mental health experts who made extensive findings regarding the existence and impact of years of childhood abuse and neglect that Lisle suffered at the hands of his mother, her boyfriends, and his older brother; injury to his brain; and a list of untreated but often well-documented mental health issues. This new evidence went far beyond the tepid mitigation evidence offered at trial that consisted of lay witnesses describing Lisle's basically good demeanor as a child and how much he meant to them, that his mother was unkind, and that he suffered isolated incidents of abuse from his older brother and his mother's boyfriends. This new evidence of mitigating circumstances also would have rebutted the State's evidence depicting Lisle as a criminal from age 11, instead recasting many of the specific instances elicited by the State at the sentencing hearing as misguided juvenile attempts to meet his own basic needs (including food and shelter) and explaining the remaining events as products of his childhood abuse and/or untreated mental and neurological disorders. This new mitigation information is, if credible, clear and convincing evidence that Lisle was not death-eligible. *See Pellegrini*, 117 Nev. at 887, 34 P.3d at 537 (stating the standard for a claim of actual innocence of the death penalty).

Lisle presented new evidence demonstrating his actual innocence of both the murder and the death penalty. Had that evidence been presented to the jury, it is more likely than not that no reasonable juror would have convicted him or sentenced him to death. We would

 

therefore remand this matter to the district court to conduct an evidentiary hearing to determine the credibility of Lisle's new evidence.

_____, J.
Cherry

_____, J.
Saitta